**Opinion filed November 15, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00216-CV

_____

## IN THE INTEREST OF B.G.J., A CHILD

**On Appeal from the 266th District Court**
**Erath County, Texas**
**Trial Court Cause No. 22FAMDC-00020**

## O P I N I O N

This is an appeal from the trial court's final order in an original suit affecting the parent-child relationship (SAPCR) that was filed by Appellee, the father of B.G.J. Appellant is the mother of B.G.J. Relying on Section 103.001 of the Family Code, Mother filed a motion to transfer venue to McCulloch County, which the trial court denied. *See* TEX. FAM. CODE ANN. § 103.001 (West Supp. 2024). After the parties presented their evidence and arguments, the trial court appointed Mother and Father as joint managing conservators of B.G.J.; however, Father was granted the exclusive right to designate the primary residence of B.G.J. within the geographical

restrictions of Erath County, Pecos County, and all counties contiguous to those counties.

In two issues, Mother asserts that (1) the trial court erred when it denied her motion to transfer venue because McCulloch County is the county of proper venue under Section 103.001; and (2) the trial court abused its discretion when it signed its final order because "it failed to ground its conclusions on findings that are supported by competent evidence in the trial record." We affirm the trial court's order.

I. *Factual and Procedural Background*

Mother and Father were not married when B.G.J. was prematurely born. On July 20, 2022, Father filed his SAPCR in Erath County seeking custody of B.G.J. In his petition, Father sought to be appointed as B.G.J.'s temporary sole managing conservator with the right to determine B.G.J.'s primary residence. Five days later, the trial court signed a temporary restraining order granting Father's requests and it scheduled a temporary hearing for August 4. On July 27, Father filed a writ of habeas corpus and writ of attachment; the same day the trial court issued a writ of habeas corpus directing Mother to produce B.G.J. at the August 4 temporary hearing.

On August 2, Mother filed a special appearance, plea to the jurisdiction (which alternatively requested that the trial court decline to exercise jurisdiction over the case), motion to transfer venue, and original answer to Father's SAPCR. Mother's trial counsel made two arguments in these filings: (1) the trial court lacked subject-matter jurisdiction over the SAPCR pursuant to Section 152.201 of the Family Code; and (2) alternatively, Erath County was not the county of proper venue for Father's SAPCR under Section 103.001 because "[t]he child does not reside in Erath County, Texas." *See* FAM. §§ 103.001, 152.201 (West 2014). Mother also requested that the trial court order that (1) she be granted temporary joint managing conservatorship of B.G.J. with the exclusive right to designate B.G.J.'s primary residence, (2) Father

2

be obligated to pay child support, and (3) Father submit to paternity testing. That same day, the trial court issued notice to Mother of the temporary hearing scheduled for August 4. At some point after August 3, Father was ordered to submit to genetic testing, the results of which confirmed that he is the biological father of B.G.J.

On August 15,[1] the trial court held a hearing on Mother's special appearance, plea to the jurisdiction, request to decline jurisdiction, and motion to transfer venue. At this hearing, Mother's trial counsel argued that Erath County was not the county of proper venue for Father's SAPCR because, under Section 103.001, Mother was the parent with actual care, custody, control, and possession of B.G.J., and she had resided in McCulloch County since July 18, 2022—two days before Father's SAPCR was filed. *See* FAM. § 103.001. In response, Father's trial counsel argued that Mother resided at a home owned by her parents in Erath County (the Dublin residence) when the SAPCR was filed.

Mother and Father testified at the hearing concerning what constituted Mother's residence as of July 20. Mother testified that she had lived at the Dublin residence with Father and B.G.J. for almost a year before Father moved from the house on July 15. On July 17, Mother had "some interactions" with "the Dublin Police Department." The following morning, at approximately 3:00 a.m., three law enforcement officers and a caseworker with the Texas Department of Family and Protective Services (the Department) visited Mother at the Dublin residence. Mother and B.G.J. moved from the Dublin residence to live with her parents in Brady (McCulloch County) "immediately" after her interactions with the caseworker and

---

[1]We note that there is no order in the clerk's record signed by the trial court indicating that the temporary hearing was rescheduled to August 15, 2022. However, the trial court's temporary orders—signed on August 29—recites that "[o]n this day [August 15] the Court heard the parties' applications for temporary orders." Further, based on the reporter's record and statements made by the trial court at the final hearing concerning the procedural history of this case, we conclude that the trial court held the temporary hearing on August 15.

law enforcement officers concluded. On July 26, Mother was served with the SAPCR at her parents' home in McCulloch County.

Father testified that he lived with Mother at the Dublin residence for approximately one year—from August or September 2021 to July 15, 2022. Father stated that, on July 15, he moved from the Dublin residence to live with his parents, who also resided in Dublin. At that time, he was not aware that Mother intended to leave Erath County. Father initially took B.G.J. with him when he moved to his parents' residence on July 15. However, due to Mother's threats to have him arrested if he did not return B.G.J. and his inability to reach anyone at the Department, Father returned B.G.J. to Mother at the Dublin residence later that day.

On July 17, Father returned to the Dublin residence to "talk things out" with Mother. Father testified that he waited in his vehicle near the Dublin residence until approximately 3:30 a.m. on July 18—the date that Mother was contacted by the Department and law enforcement—because "[he] was there to get [his] son." Father stated that Mother was "going to move with [B.G.J.]" from the Dublin residence to her parents' house on July 18 after she spoke with the officers and the caseworker that morning. Mother then left the Dublin residence later that same day. According to Father, the SAPCR was filed on July 20 because "that was the quickest [he] could get in to [see] an attorney." After hearing the testimony and arguments of the parties, the trial court orally denied Mother's special appearance and motion to transfer venue.

The trial court then permitted the parties to present the testimony of six witnesses and offer four exhibits, which it admitted, prior to issuing its temporary orders. On August 29, the trial court signed its temporary orders which designated Mother and Father as joint managing conservators of B.G.J. with Father retaining

the exclusive right to designate B.G.J.'s primary residence within the geographical restriction of Erath County.

On December 27, the trial court signed agreed, modified temporary orders.[2] On February 13, 2023, the trial court was advised that the parties had again agreed to modify the temporary orders. After Father filed a request for a jury trial, the trial court denied the parties' requests for additional temporary orders and scheduled the jury trial for June 5, 2023. On April 18, the amicus attorney for B.G.J. filed an emergency motion to modify the trial court's temporary orders, which the amicus attorney later amended on April 24. In the amended motion, which Mother joined, Mother requested, among other things, that she be granted immediate primary possession of B.G.J. and that Father's right to possession of B.G.J. either be suspended or supervised. On May 1, the trial court held a hearing on the emergency motion, which it later granted on May 15.[3]

On May 25, Father withdrew his request for a jury trial; the case then proceeded to a final hearing before the trial court on June 8. In addition to receiving testimony from several witnesses, the trial court admitted the following exhibits during the final hearing: (1) Mother's Dublin I.S.D. employment records; (2) Mother's Interlock records; (3) Father's SCRAM monitor results; (4) B.G.J.'s medical records from Shannon Medical Center (located in San Angelo);

---

[2]At the final hearing, the trial court recited the procedural history of this case into the record. Despite the trial court's thorough recitations, we note that several motions and orders that it referenced are absent from the clerk's record on appeal. Notably, the clerk's record does not contain any requests for the preparation of either the clerk's record or the reporter's record, although the clerk of the trial court and the official court reporter certified that all documents requested by Mother were included in the appellate record. *See* TEX. R. APP. P. 34.5(a)(9)–(10), 34.6(c)(1).

[3]We also note that the trial court's order granting the emergency motion is not contained in the clerk's record on appeal.

(5) Mother's medical records from Shannon Medical Center;[4] (6) text message communications between Father and Mother; (7) Father's drug test results; (8) photographs depicting B.G.J. with a black eye; (9) photographs of B.G.J. with Father's family; and (10) the psychological evaluations of Father and Mother.

Tracey Heiser, B.G.J.'s occupational therapist, evaluated B.G.J. and testified that B.G.J. exhibited developmental delays, which she believed were caused by possible neurological issues. Heiser stated that B.G.J.'s pediatrician concluded that B.G.J. had been adversely affected by Mother's use of alcohol during her pregnancy with B.G.J. According to Heiser and B.G.J.'s pediatrician, this type of diagnosis indicates that a child's developmental delays are caused by the child's exposure to alcohol while in utero.

Heiser referred B.G.J. to a neurological specialist, but Father and Mother were unable to discuss B.G.J.'s diagnosis with the neurologist before the final hearing commenced. Mother testified that, as of the final hearing, B.G.J. had other medical appointments scheduled to discuss whether indicators of fetal-alcohol syndrome existed, and that she and Father would need to monitor B.G.J.'s condition as it pertained to fetal-alcohol syndrome in the future.

Father testified that he first became aware that Mother was pregnant in December 2021, but he does not know the exact date of B.G.J.'s conception. Father testified that he and Mother did not speak from May 31 until B.G.J.'s birth on June 11. Because of complications encountered during childbirth, B.G.J. spent the first twelve days of his life in a neonatal intensive care unit (NICU).

Father stated that he was concerned about Mother's "heavy drinking" when she has possession of B.G.J., and that she was belligerent and violent when she

---

[4]The trial court admitted these records under seal.

consumed alcohol. According to Father, Mother's Interlock records show that she registered a blood-alcohol level over the legal limit (0.08) twenty-nine times from January 2021 to February 2023. Mother attempted to stop consuming alcohol, but she relapsed in September 2022; she was later admitted to an inpatient rehabilitation facility for treatment in October 2022. Father also testified that he did not have any SCRAM monitor violations as of the date of the final hearing.

At the time of the final hearing, Father was still living with his parents in Dublin. However, Father testified that he sought the exclusive right to designate B.G.J.'s primary residence without any geographic restriction because he wanted to move to Fort Stockton (Pecos County) to be closer to his support network—his family and friends. Father also stated that "the plan [for] the last ten years [was] move to the ranch out in [W]est Texas," and that this was "the plan all along" even during his relationship with Mother. Father spoke with B.G.J.'s physicians about transferring the child's medical services to their medical facilities in Midland, and he confirmed that, if they moved to Pecos County, B.G.J. would continue receiving medical care from the same physicians who are currently treating him.

Father testified that he has a house on a ranch in Pecos County that he could move to. Father stated that his parents would also move and live with him at this ranch house because they want "to move out there to retire." Father has a potential job opportunity in Pecos County where he, his father, and an acquaintance would design firearm suppressors. According to Father, he already has three patents approved for the design of a firearm suppressor. While he did not currently have a license to manufacture firearm suppressors, he was previously licensed and was "going through [the] licensing setup" as of the date of the final hearing. Alternatively, Father stated that he could work as a general machinist in Pecos County.

Mother testified that she is an alcoholic. She had previously been admitted to three different inpatient rehabilitation facilities to treat her alcoholism, and she stated that her past attempts to become sober were unsuccessful. However, Mother stated that she has continued her rehabilitative efforts at a fourth rehabilitation center, and she stated that she had been sober for 250 days as of the final hearing.

According to Mother, her father installed an Interlock device on her vehicle in 2020—before she became pregnant—due to her excessive alcohol consumption. She testified that she had previously been arrested and charged with driving while intoxicated (DWI), assault family violence, and public intoxication. At the final hearing, Mother admitted that: (1) she was under the influence of alcohol during an administrative meeting for Dublin I.S.D. in July 2021; (2) on October 13, 2021, she had an "incident involving alcohol where she was arrested" and jailed;[5] (3) she was arrested for public intoxication on September 26, 2022, after consuming alcohol that day; (4) her criminal charges for assaulting Father were dismissed; and (5) she was on probation for the DWI offense until her discharge from community supervision on August 9, 2023—which occurred after the date of the final hearing.

Mother stated that she sought the exclusive right to designate B.G.J.'s primary residence within McCullough County, and the counties contiguous to McCullough County, Erath County, and Tom Green County. She was working for her sister at a boutique in San Angelo and hoped to eventually move with B.G.J. to Tom Green County to be closer to family. Additionally, Mother testified that she moved to her parents' house in McCulloch County "a month after [B.G.J.] was born . . . two weeks after [B.G.J. was] released from the hospital." However, Mother later testified that she had moved to McCulloch County prior to B.G.J.'s birth. In clarifying when she

---

[5]Mother's employment records from Dublin I.S.D. show that she was arrested on October 13, 2021, for DWI.

moved, Mother stated that she had "already moved to [her] parents' house before [she] went into labor." Then, after B.G.J. was born, her parents brought B.G.J.'s crib and other things from their house in McCulloch County to the Dublin residence. According to Mother, she then resided at the Dublin residence for two weeks before she and Father "split again."

After Mother's testimony concluded, the trial court orally pronounced and appointed Mother and Father as joint managing conservators of B.G.J. In addition, the trial court granted Father the exclusive right to designate the primary residence of B.G.J. within the geographical restrictions of Erath County, Pecos County, or counties contiguous to either Erath County or Pecos County. After the trial court signed its final order, Mother requested that the trial court issue findings of fact and conclusions of law with respect to its rulings as stated in its final order, which the trial court did. *See* TEX. R. CIV. P. 296. This appeal followed.

## II. *Standards of Review*

### A. *Proper Venue for SAPCRs*

Except where otherwise provided, an original suit affecting the parent-child relationship shall be filed in the county where the child resides unless: (1) another court has continuing, exclusive jurisdiction, with respect to the child and all matters that pertain to the child, under Chapter 155 of the Family Code; or (2) venue is fixed in a suit for the dissolution of a marriage. FAM. § 103.001(a). When venue is "improper in the court in which an original suit is filed and no other court has continuing, exclusive jurisdiction of the suit, on the timely motion of a party other than the petitioner, the [trial] court shall transfer the proceeding to the county where venue is proper." *Id.* § 103.002(a).

If the trial court's venue determination is challenged on appeal from a final order or judgment, the reviewing court must conduct an independent review of the

9

entire record, including the trial on the merits. *Fortenberry v. Great Divide Ins. Co.*, 664 S.W.3d 807, 811 (Tex. 2023); *Wilson v. Texas Parks & Wildlife Dept.*, 886 S.W.2d 259, 260–62 (Tex. 1994); *see also Pines of Westbury, Ltd. v. Paul Michael Const., Inc.*, 993 S.W.2d 291, 293 (Tex. App.—Eastland 1999, pet. denied); FAM. § 109.002. Thus, in determining whether a venue determination was or was not proper, we conduct an independent review of the entire record and consider if there is any probative evidence to support the trial court's venue decision; however, we do not defer to the trial court's application of the law. *See Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 758 (Tex. 1993); *see In re B.L.Z.P.*, No. 05-21-00987-CV, 2022 WL 4494133, at \*4 (Tex. App.—Dallas Sept. 28, 2022, no pet.) (mem. op.) (citing *Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 357 (Tex. App.—Dallas 2009, pet. denied)).

We must uphold the trial court's venue determination if there is any probative evidence in the record to show that its decision was correct. *See Ruiz,* 868 S.W.2d at 758; *see In re B.L.Z.P.*, 2022 WL 4494133, at \*4 (citing *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 471 (Tex. 1995)). If there is no probative evidence to support the trial court's venue determination, the trial court's judgment must be reversed, and the case must be remanded to the trial court. *See Ruiz*, 868 S.W.2d at 758; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 15.064(b) (West 2017).

B. *Statutory Construction*

Whether venue was proper in this case in Erath County turns on ascertaining the child's county of residence under Section 103.001. We review questions of statutory interpretation de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). "When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *see* TEX. GOV'T CODE ANN. § 312.005 (West 2013).

10

We begin by examining the plain meaning of the statute's language. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). We derive legislative intent from the statute as a whole rather than from isolated portions of it. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). That is, we read statutes contextually to give effect to every word, clause, and sentence because every word and phrase is presumed to have been used intentionally, with a meaning and a purpose. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." GOV'T § 311.011; *Cadena Commercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017).

"If the statute is clear and unambiguous, we must read the language according to its common meaning 'without resort to rules of construction or extrinsic aids.'" *Crosstex Energy Servs.*, 430 S.W.3d at 389 (quoting *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)). Further, if a statute is unambiguous, we adopt the interpretation that is supported by the statute's plain language unless such an interpretation would yield an absurd result. *TGS-NOPEC*, 340 S.W.3d at 439 (citing *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004)). "A statute is ambiguous if its words are susceptible to two or more reasonable interpretations and we cannot discern legislative intent from the language alone." *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

C. *Sufficiency of the Evidence*

Because the trial court is vested with broad discretion in making decisions in family law cases regarding child custody, possession, and visitation, we review the trial court's decisions in those areas for an abuse of that discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re A.J.E.*, 372 S.W.3d 696, 698 (Tex.

App.—Eastland 2012, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to guiding principles or when it fails to correctly analyze or apply the law. *See J.A.J.*, 243 S.W.3d at 616; *A.J.E.*, 372 S.W.3d at 698.

When an abuse-of-discretion standard applies to a trial court's ruling, as it does here, and the trial court issues findings of fact and conclusions of law, as it did in this case, the "findings of fact and conclusions of law aid us in reviewing the propriety of the [trial court's] ruling[s] by providing us with an explanation for the ruling[s]." *In re M.J.G.*, 248 S.W.3d 753, 761 (Tex. App.—Fort Worth 2008, no pet.) (citing *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex. 1992)). A trial court's findings of fact that arise from a SAPCR are reviewed for legal and factual sufficiency. *In re L.A.F.*, 270 S.W.3d 735, 739 (Tex. App.—Dallas 2008, pet. denied); *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex. App.—El Paso 2005, no pet.).

Legal and factual sufficiency challenges are not independent grounds of error in family law cases, but rather are factors that we use to determine whether the trial court abused its discretion. *In re E.R.D.*, 671 S.W.3d 682, 686–87 (Tex. App.—Eastland 2023, no pet.); *A.J.E.*, 372 S.W.3d at 698. In determining whether the trial court abused its discretion, we consider whether it had sufficient information upon which to exercise its discretion and, if so, whether it erred in the application of that discretion. *In re J.H.C.*, No. 11-17-00187-CV, 2019 WL 2557542, at *6 (Tex. App.—Eastland June 20, 2019, no pet.) (mem. op.). In conducting our analysis, the sufficiency-of-the-evidence review is part of the first inquiry. *Id.* After we evaluate the sufficiency of the evidence, we consider whether, based on that evidence, the trial court made a reasonable decision. *Id.*

We are mindful that conservatorship determinations are "intensely fact driven," *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), and that the trial court "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *J.H.C.*, 2019 WL 2557542, at *6 (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)); *see also Pore v. Ellis*, No. 03-20-00550-CV, 2021 WL 5095496, at *3 (Tex. App.—Austin Nov. 3, 2021, no pet.) (mem. op.) ("A factfinder's decision on conflicts in the evidence is generally viewed as conclusive."). Thus, a trial court does not abuse its discretion when it bases its decision on conflicting evidence so long as there is some evidence of a substantive and probative character that supports its decision. *E.R.D.*, 671 S.W.3d at 687; *J.H.C.*, 2019 WL 2557542, at *6; *A.J.E.*, 372 S.W.3d at 699.

Further, while an erroneous finding of fact on an ultimate fact issue constitutes harmful error, an immaterial finding of fact is harmless and not a ground for reversal. *Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.). An ultimate fact issue, which a trial court is required to include in its requested written findings of fact, is one that is essential to a cause of action and has a direct effect on the judgment. *In re Marriage of Edwards*, 79 S.W.3d 88, 94 (Tex. App.—Texarkana 2002, no pet.). However, an evidentiary issue, which a trial court is not required to include in its requested written findings, is one that may be considered in deciding the controlling issue but is not itself controlling. *Id.*

### III. *Analysis*

Mother presents two issues for our review. First, Mother argues that the trial court erred when it denied her motion to transfer venue because the evidence shows that Mother and B.G.J. lived in McCulloch County at the time the SAPCR was filed; thus, the trial court had a mandatory duty to transfer the SAPCR to McCulloch

County. *See* FAM. § 103.001(c). Second, Mother argues that the trial court abused its discretion when it signed its final order because the trial court's findings of fact are not supported by legally or factually sufficient evidence.

A. *Mother's Motion to Transfer Venue*

In her first issue, Mother argues that the trial court erred when it denied her motion to transfer venue because the evidence established that, under Section 103.001(c), proper venue for the SAPCR rests in McCulloch County. *See* FAM. § 103.001(c)(2). Specifically, Mother contends that the trial court erroneously applied a time requirement to Section 103.001 when it "essentially determined that [Mother] had not lived in Brady long enough to conclusively establish a permanent residence in McCulloch County." *Id.* Additionally, Mother argues that the evidence shows that the trial court was required to transfer the SAPCR to McCulloch County because: (1) Mother lived with her parents in McCulloch County on the date that the SAPCR was filed; (2) B.G.J. "resided" in McCulloch County with Mother—who had actual care, possession, and control of the child—when the SAPCR was filed; and (3) Father failed to controvert that Mother intended to remain in McCulloch County with her parents. In response, Father argues that, for purposes of Section 103.001, Mother failed to prove that she "resided" in McCulloch County at the relevant time.

Generally, the transfer procedures in the Family Code are the exclusive mechanisms for transferring SAPCRs. *Cooper v. Johnston*, No. 11-11-00110-CV, 2011 WL 4137731, at *2 (Tex. App.—Eastland Sept. 15, 2011, no pet.) (mem. op.); *In re Nabors*, 276 S.W.3d 190, 194 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding). In such suits, the applicable Family Code venue provisions supplant the Texas Rules of Civil Procedure and the venue statutes that govern venue challenges in other types of civil cases. *Leonard v. Paxson*, 654 S.W.2d 440, 441

14

(Tex. 1983); *Nabors*, 276 S.W.3d at 194; *In re Kerst*, 237 S.W.3d 441, 443 n.2 (Tex. App.—Texarkana 2007, orig. proceeding).

As relevant to this appeal, a SAPCR "shall be filed in the county where the child resides, unless: (1) another court has continuing exclusive jurisdiction under Chapter 155; or (2) venue is fixed in a suit for dissolution of a marriage under Subchapter D, Chapter 6." FAM. § 103.001(a). Here, Mother and Father never married, the proceeding before the trial court did not involve a divorce or adoption, and B.G.J. was not subject to a different or competing SAPCR filing prior to the filing of this proceeding. As such, there is no court of continuing jurisdiction over B.G.J. or this matter. Therefore, to determine the proper venue for this SAPCR, we must look to where B.G.J. resided during the relevant time under the controlling statute. *Id.*

In a SAPCR, for purposes of venue, a child resides in the county where both parents reside; however, "if the *parents* of the child *do not reside in the same county* and if a managing conservator, custodian, or guardian of the person has not been appointed, the child resides in the county where the parent having actual care, control, and possession of the child resides." *Id.* § 103.001(c)(2) (emphasis added). If venue of a SAPCR is improper, then, on the timely motion of a party other than the petitioner, the trial court shall transfer the proceeding to the county where venue is proper. *Id.* § 103.002.

The procedures for transferring a SAPCR are governed by Chapter 155 of the Family Code.[6] *Id.* § 103.002(c)(1). Here, Mother timely filed a motion to transfer

---

[6]In Mother's reply brief, she argues that the trial court erred when it did not transfer this SAPCR to McCulloch County because Father failed to timely file a controverting affidavit within twenty-one days of the filing of Mother's motion to transfer venue. *See* FAM. § 155.204. While we note that Father did not file a controverting affidavit, we need not address this argument because the trial court determined on August 15—thirteen days after Mother filed her motion to transfer venue—that Erath County was the

venue to McCulloch County. Thus, to establish that McCulloch County is the county of proper venue for this SAPCR, as Mother suggests, the evidence before us must show that at the time the SAPCR was filed on July 20, (1) neither Mother nor Father resided in Erath County, and (2) B.G.J. resided in McCulloch County with Mother—who, as of July 18, had actual care, possession, and control of B.G.J. *Id.* § 103.001(c).

As Mother points out, some Texas courts have recognized that, for purposes of determining one's "residency," Section 103.001 "does not expressly state the time frame [that is] relevant to the [trial] court's inquiry into a parent's actual care, control, and possession of a minor child." *In re Narvaiz*, 193 S.W.3d 695, 700 (Tex. App.—Beaumont 2006, orig. proceeding); *see also In re Martinez*, 592 S.W.3d 170, 176 (Tex. App.—Tyler 2019, orig. proceeding); *In re Allen*, 593 S.W.2d 133, 136 (Tex. App.—Amarillo 1979, no writ). On the other hand, the legislature included a specific time-limitation residency requirement in Section 155.201(b) for the transfer of *pending* actions that seek to *modify* the parent-child relationship—in such actions if a modification is sought, a transfer of the pending action from a court with continuing, exclusive jurisdiction to another county must be ordered if "the child has resided in the other county for six months or longer." FAM. § 155.201(b).

Further, other Texas courts have generally held, and we agree, that it is inappropriate to infer a time limitation into Section 103.001's residency requirement because the legislature chose not to incorporate such a requirement into the plain language of the statute. *See Martinez*, 592 S.W.3d at 176 (citing *Williams v. Tex. State Bd. Of Orthotics & Prosthetics*, 150 S.W.3d 563, 573 (Tex. App.—Austin

---

county of proper venue for this SAPCR. *See id.* ("If a timely motion to transfer has been filed and no controverting affidavit is filed within the period allowed for its filing, the proceeding shall, not later than the 21st day after the final date of the period allowed for the filing of a controverting affidavit, be transferred without a hearing *to the proper court*." (emphasis added)).

2004, no pet.)); *Narvaiz*, 193 S.W.3d at 700 (stating that "had the Legislature desired that the pertinent time frame [for residency] incorporate a period of time prior to the date of the initial filing of the SAPCR, it could have included this requirement in [S]ection 103.001"); *McManus v. Wilborn*, 932 S.W.2d 662, 665 (Tex. App.— Houston [14th Dist.] 1996, orig. proceeding) (holding that "the length of residency provisions found in Chapter 155 are not applicable in original suits affecting the parent-child relationship"). Thus, in the absence of legislative action, we presume that, unlike modification proceedings, a specific time-limitation residency requirement does not apply to *original* actions governed by Section 103.001.

Here, it is undisputed that Mother had possession of B.G.J. on the date that Father filed the SAPCR in Erath County. Therefore, for purposes of venue, and given that Mother denies that she resided in Erath County during the relevant time, the primary question that we must address is whether Mother "resided" in McCulloch County when the SAPCR was filed. *See Martinez*, 592 S.W.3d at 176.

The term "residence" is elastic and difficult to define. *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964). Ascertaining a person's residence depends upon the circumstances, volition, intention, and actions of the person, and each of these elements are pertinent to a trial court's determination of a person's *permanent* residence or domicile. *Id.* The Family Code does not expressly identify the requirements that must be met to establish a person's residency, or where a person "resides," for the purposes of Section 103.001(c). However, the Texas Supreme Court has articulated the elements of residency that apply under the general civil venue statute. *See Snyder v. Pitts*, 241 S.W.2d 136, 140 (Tex. 1951) (holding that the elements of a person's residency include whether the residence is (1) a fixed place of abode within the possession of the party, (2) occupied or *intended to be occupied consistently over a substantial period of time*, and (3) *permanent* rather

17

than temporary); *see also Tieuel v. S. Pac. Transp. Co.*, 654 S.W.2d 771, 774 (Tex. App.—Houston [14th Dist.] 1983, no writ) ("The element of *permanency* is critical to establishing residency for venue purposes." (emphasis added)). These factors are instructive and guide our analysis.

In determining the residency of a party under the Family Code, some Texas courts have held that the element of *permanency* is necessary and must exist before a party can be considered a resident of a certain county. *See Martinez*, 592 S.W.3d at 176; *Narvaiz*, 193 S.W.3d at 701; *In re S.D.*, 980 S.W.2d 758, 760 (Tex. App.—San Antonio 1998, pet. denied); *see also In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.—Fort Worth 2008, orig. proceeding) (determining a child's principal residence under Section 102.003(b) of the Family Code); *Doncer v. Dickerson*, 81 S.W.3d 349, 361 (Tex. App.—El Paso 2002, no pet.) (also determining residency under Section 102.003); *Cook v. Mayfield*, 886 S.W.2d 840, 842 (Tex. App.—Waco 1994, orig. proceeding) (holding that a determination of residency for a party in a suit for divorce "requires an actual, physical, continuous living in the county of suit by one of the parties for the period specified, coupled with a good-faith intent to make that county home." (quoting *Beavers v. Beavers*, 543 S.W.2d 720, 721 (Tex. App.—Waco 1976, no writ), *reh'g denied*, 545 S.W.2d 29)); *Martinez v. Flores*, 820 S.W.2d 937, 940 (Tex. App.—Corpus Christi–Edinburg 1991, no writ) (permanence is a requirement for residency). We agree with this rationale.

Thus, we conclude, as some of our sister courts have, that to establish residency in another county under Section 103.001, a party must show "an *intention* to establish a *permanent* domicile or home, and the intention must be accompanied by some act done in the execution of the intent." *Martinez*, 592 S.W.3d at 176 (emphasis added) (citing *In re Lee-Cole*, No. 12-17-00179-CV, 2017 WL 3048488, at *3 (Tex. App.—Tyler July 19, 2017, orig. proceeding) (mem. op.)). The *intent* to

18

establish a *permanent* domicile may be shown by a party's "presence in the county for an extended period of time or by some agreement, explicit or implied, by the party with a right to control the child's residence, for the child to stay in the new county for an extended period of time." *See Kelso*, 266 S.W.3d at 590–91 (quoting *Doncer*, 81 S.W.3d at 361). Further, a party's residence in another county for purposes of Section 103.001 must be established at the time the SAPCR is filed. *Martinez*, 592 S.W.3d at 176; *Narvaiz*, 193 S.W.3d at 700–01; *see also In re Rowe*, 182 S.W.3d 424, 426 (Tex. App.—Eastland 2005, orig. proceeding) (residency must be established in a divorce action).

Mother relies primarily on *Narvaiz* and *McManus* in support of her argument that proper venue is determined by the county where the child resides when the SAPCR is filed, and that the trial court erred in refusing to transfer the SAPCR to McCulloch County because that is the county where she, as the parent with "actual possession" of the B.G.J., resided when the SAPCR was filed. *See Narvaiz*, 193 S.W.3d at 700; *McManus*, 932 S.W.2d at 665. In response, Father relies on *Martinez* and asserts that the trial court properly denied Mother's motion. *See Martinez*, 592 S.W.3d at 173; *S.D.*, 980 S.W.2d at 760–61.

In *McManus*, the Fourteenth Court of Appeals considered whether the trial court erred when it denied the mother's motion to transfer venue. *See McManus*, 932 S.W.2d at 664–65. The child's mother and father divorced prior to the child's birth. *Id.* at 663. The mother lived periodically with the father before the child was born, and she moved with the child to Galveston County—ten days before the father filed his SAPCR in Chambers County. *Id.* The mother filed a motion to transfer venue to Galveston County, which the trial court denied. *Id.* In reviewing the trial court's ruling, the Fourteenth Court of Appeals held that (1) Section 103.001 applied to the father's SAPCR, (2) the six-month residency requirement in Section 155.204

did not apply to a SAPCR proceeding, and (3) venue was proper in Galveston County because that was the county where the parent who had actual possession of the child resided at the time the SAPCR was filed. *Id.* at 665; *see also* FAM. § 155.204. Importantly, the court in *McManus* did not analyze or address the element of the permanency of the mother's residence in arriving at its decision.

Similarly, in *Narvaiz*, the Ninth Court of Appeals considered whether venue was proper in the county where a parent has actual possession of the child. *Narvaiz*, 193 S.W.3d at 696–97. The mother initially moved from Montgomery County— where the child's father resided—to Port Lavaca in 2002 and then to Bexar County in 2003. *Id.* Prior to the father filing suit, both parents exchanged custody of the child between their respective residences. *Id.* at 697. However, in August 2005, after a dispute arose regarding custody where the mother retained possession of the child, the father filed a SAPCR alleging that the child resided in Montgomery County. *Id.* When the SAPCR was filed, it was undisputed that the mother had actual possession and control of the child. *Id.* Following this, the mother filed a timely motion to transfer venue to Bexar County, which the trial court denied. *Id.* at 697–700.

On appeal, the Ninth Court of Appeals held that the trial court abused its discretion when it denied the mother's motion—and that venue in Bexar County was proper—because the mother had actual possession and control of the child at the time the SAPCR was filed. *Id.* at 701. In its holding, the court acknowledged that a permanency requirement was necessary to a trial court's determination of a party's residence under Section 103.001; however, and similar to the court's holding in *McManus*, the court in *Narviaz* did not analyze how the facts before it supported the elements of permanency as to the mother's residence—for instance, that the mother enrolled the child in school prior to the filing of the father's suit. *See id.* ("June

2005, [the mother] enrolled the child for school, although school did not actually start until August 2005."). Thus, although there is an absence of a permanency analysis in its holding, we believe it is significant that the court noted that a trial court should consider the *permanency* of a venue movant's residence in making its venue determination. In this context, we conclude that it should.

Finally, in *Martinez*, the Twelfth Court of Appeals considered whether the trial court's denial of a motion to transfer venue was proper. *Martinez*, 592 S.W.3d at 173–74. The mother of the child filed a SAPCR in El Paso County. *Id.* Ten days later, the father filed his SAPCR in Shelby County, and contended that the child had resided in Shelby County since his birth until the mother absconded with the child to El Paso County five days before she filed her SAPCR. *Id.* The mother filed a motion to transfer the father's SAPCR from Shelby County to El Paso County contending that the transfer was mandatory, and because venue was proper in El Paso County; the trial court denied the mother's motion. *Id.* The court examined the elements of permanency and concluded that the trial court did not err when it denied the mother's motion because no evidence of permanency was presented, namely that the mother (1) had neither obtained employment in El Paso County nor was she actively seeking employment there, (2) had not enrolled her children in any school or daycare there, (3) did not pay rent to her aunt (with whom she lived when she moved to El Paso County), or otherwise have any right of possession to her aunt's home other than as a visitor, and (4) had not taken any steps or pursued any action that would demonstrate an intent to remain in El Paso County for a substantial or extended period of time. *Id.* at 177; *see Snyder*, 241 S.W.2d at 140; *S.D.*, 980 S.W.2d at 760–61; *Lee-Cole*, 2017 WL 3048488, at *3.

The facts and circumstances before us are remarkably similar to those in *Martinez*. Here, like in *Martinez*—with which we agree and follow—the evidence

21

fails to show that Mother met any of the elements of permanency that would be necessary to establish a "residence" in McCulloch County for purposes of Section 103.001. During the hearing on her motion to transfer venue, Mother testified that she and B.G.J. began staying with her parents in McCulloch County on July 18, two days before Father filed his SAPCR. During the final hearing, Mother stated that she had "moved to Brady, and then moved back" to Dublin—although it is unclear from the record when this occurred—and that she lived at the Dublin residence for two weeks before she and Father "split again." However, there is no evidence that Mother (1) intended to remain in McCulloch County for an extended or substantial period of time or (2) made any arrangements or took any action— either explicit or implied—to assure that she and B.G.J. would remain in McCulloch County for an extended or substantial period of time. *See Kelso*, 266 S.W.3d at 590–91. Indeed, her presence there could have been temporary, as it had been many times in the past. Moreover, there is no evidence that Mother (1) paid any rent to her parents, (2) paid for any utilities, (3) sought any form of employment in McCulloch County, or (4) had any right of possession to her parents' home in McCulloch County. *See Martinez*, 592 S.W.3d at 176.

As such, we conclude that, when Father filed his SAPCR on July 20, the elements of permanency that were necessary for Mother to establish a "residence" in McCulloch County under Section 103.001 did not exist. *See Martinez*, 592 S.W.3d at 176; *Narvaiz*, 193 S.W.3d at 700–01. Therefore, the trial court did not err when it denied Mother's motion to transfer venue and determined that the proper venue for Father's SAPCR is in Erath County.

Irrespective of the trial court's ruling, Mother submits that she had "a fixed place of abode" in McCulloch County in that she had the right to possession in tenancy by operation of law because (1) her testimony at the hearing on her motion

22

to transfer venue established that she lived in McCulloch County at the time the SAPCR was filed, (2) Father's writ of attachment identified her residence at the time the SAPCR was filed and shows that he had knowledge of Mother's new residence, and (3) there is no evidence that she intended to return to Dublin.

Despite Mother's contentions, simply staying with her parents in McCulloch County for two days before the SAPCR was filed is not enough to establish that she had a "fixed place of abode" there. *See Snyder*, 241 S.W.2d at 140 (stating that for a place of abode to become a residence, a party must show that they "have some right of possession and not be a mere visitor"). As we previously discussed, there is no evidence that Mother intended to remain in McCulloch County for an extended or a substantial period of time, nor is there any evidence of the other elements of permanency that are required to establish one's "residence." Temporary living arrangements are not synonymous with either a permanent residence or a "fixed place of abode."

Additionally, Mother argues that the trial court, for purposes of determining residency, erroneously applied a time requirement when it denied her motion to transfer venue because "the trial court essentially determined that [Mother] had not lived at the Brady residence long enough to establish a permanent residence in McCulloch County." However, the record does not support Mother's contention. At the hearing on her motion to transfer venue, and after the parties had presented their evidence and arguments, the trial court took a brief recess to research the issue of proper venue in SAPCR actions. Later, when the trial court orally ruled on Mother's motion, it stated:

> After doing a hurried amount of legal research . . . there is not a statutory definition of residency. It takes some form or analysis to define or to establish residency, which will have some sort of permanency requirement.

23

We cannot say that the trial court, based on its comments, improperly imposed a rigid time requirement in determining Mother's county of residence at the time the SAPCR was filed; rather, the above comments show that the trial court carefully considered the evidence and properly determined that Mother failed to prove the necessary elements of permanency in order to establish her residency in McCulloch County.

Finally, Mother contends that Father "failed to establish that venue was proper in Erath County, as he himself moved to his parents' house with a long-term plan to move to Pecos[] County." First, we reiterate that it is Mother's county of residence—not Father's—that is challenged and is the primary focus of this venue determination. Second, Father resided in Erath County when he filed the SAPCR, and throughout the pendency of the proceedings in the trial court. His "plan" to move to Pecos County at some undetermined point in the future does not invalidate his established residence in Erath County when the SAPCR was filed. *See Martinez*, 592 S.W.3d at 176; *Narvaiz*, 193 S.W.3d at 700–01 (holding that residency and possession must be established at the time the SAPCR was filed); *see also* FAM. § 103.001. Therefore, we conclude that the trial court properly determined that Mother *and* Father both "resided" in Erath County at the time Father's SAPCR was filed.

Accordingly, we overrule Mother's first issue on appeal.

B. *The Trial Court's Final Order*

In her second issue, Mother argues that the trial court abused its discretion when it signed its final order because the order was based on findings of fact that are not supported by legally or factually sufficient evidence. Specifically, Mother contends that the evidence is legally and factually insufficient to support the trial court's order granting Father the exclusive right to designate B.G.J.'s primary

24

residence and finding that the geographical restrictions for such residency—Erath County, Pecos County, or counties contiguous to either Erath County or Pecos County—are in B.G.J.'s best interest.

In support of her contention that the trial court abused its discretion when it granted Father the exclusive right to determine B.G.J.'s primary residence, Mother argues that the trial court was not permitted to make findings of fact based on: (1) exhibits that are not included in the appellate record; (2) specific pages from exhibits in the record that were not identified when the exhibits were admitted; (3) the time period before B.G.J.'s birth; and (4) any medical conclusions that address medical diagnoses or causation that are derived from evidence that was admitted without the aid of expert testimony. We address each complaint in turn.

### 1. *The Trial Court's Consideration of Trial Exhibits*

Mother contends that the evidence is legally and factually insufficient to support the trial court's findings of fact—and that the trial court's final order is therefore arbitrary and unreasonable—because the trial court referenced multiple exhibits in its findings of fact that are not included in the record. We note that the trial court expressly referred to certain exhibits, that it admitted, in its written findings of fact that do not specifically correlate numerically with certain exhibits in the appellate record. However, after reviewing the record, most of the exhibits referenced by the trial court in its written findings of fact are included in the record that Mother requested for appeal and support the trial court's findings of fact that are necessary to the disposition of this appeal.[7]

---

[7]At the final hearing, the trial court admitted Father's Exhibit No. 5—Mother's medical records— and the trial court orally stated that these records would be sealed for purposes of the appellate record. However, as Mother points out, this exhibit is not included in the appellate record. Notably, the clerk's record does not contain a request from Mother for either the preparation of the clerk's record or the reporter's record. Despite this, and as we have said, the trial court clerk certified that the record contains

Mother further contends that that the trial court could not consider specific pages from exhibits that are referenced in its findings because "the trial court . . . told the parties and counsel that it would only consider the contents of records specifically identified to the court." Mother cites *Woody v. Woody* to support her argument; however, *Woody* is readily distinguishable because it concerns a trial court's incorporation of a revoked Rule 11 agreement into its final judgment. *See Woody v. Woody*, 429 S.W.3d 792, 795–96 (Tex. App.—Houston [14th Dist.] 2014, no pet.). While we recognize that, at the beginning of the final hearing, the trial court advised the parties that they needed to draw the trial court's attention to specific pages in the admitted documentary evidence that they wanted the trial court to consider, the trial court's statements did not restrict what admitted evidence it could consider in making its rulings. In a bench trial setting, the trial court may consider any of the evidence that it has admitted and which it deems relevant to the issues that it must determine. In any event, the challenged evidence is cumulative of other admitted evidence and testimony in the record. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). As such, the trial court neither erred nor abused its discretion in considering the admitted evidence it deemed necessary to making its determinations and findings.

---

all documents specified by Rules 34.5(a) and (b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 34.5(a), (b). We further note that the Texas Rules of Appellate Procedure no longer place the burden to designate items to be included in the clerk's record on any party, but instead permit any party, the trial court, or the appellate court to do so. *See id.* 34.5(a), (b)(2), (c)(1); *Russell as Tr. of Jennifer McGough Russell Tr. v. McGough as Tr. of John Michael McGough Tr.*, No. 11-19-00270-CV, 2021 WL 3557574, at *1 (Tex. App.—Eastland Aug. 12, 2021, no pet.) (mem. op.); *In re Estate of Nunu*, 542 S.W.3d 67, 74 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re K.M.L.*, 443 S.W.3d 101, 119 (Tex. 2014)). Here, neither party requested to supplement either the clerk's record or the reporter's record to include this missing exhibit. Nevertheless, the procedural disposition of this case, the applicable standards of review, and the nature of the issues presented permit us to dispose of this appeal. *See* TEX. R. APP. P. 34.5(c), 34.6(d).

## 2. *The Best Interest Determination*

With respect to the best interest of a child, no unique set of factors need be proved. *In re L.C.C.*, 667 S.W.3d 510, 513 (Tex. App.—Eastland 2023, pet. denied); *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). In fact, the trial court may consider a variety of factors in making its best interest determination. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "Proof of best interest is not limited to [the *Holley*] factors, nor do all factors always apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In other words, evidence of each *Holley* factor is not required to support a best interest finding. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). Although no single factor is controlling, evidence of a single factor may, in some instances, be sufficient to support the trial court's best-interest finding. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.).

Mother argues that the trial court, in making its best interest determination, could neither consider, nor make findings of fact regarding, the period of time that predated B.G.J.'s birth. While some of the trial court's findings addressed events that occurred before October 2021, around the time that B.G.J. was conceived, the specific findings of which Mother complains concern and focus on her history of alcohol abuse and criminal conduct. The factfinder may measure a parent's future conduct by her past conduct in evaluating the child's best interest. *J.S.*, 687 S.W.3d at 552; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). Further, any evidence of a mother's alcohol abuse during her pregnancy constitutes conduct which endangers a child's physical and emotional development and well-being, and the trial court may consider that parent's use of alcohol during pregnancy in making its best interest determination. *See In re A.R.D.*, 694 S.W.3d 829, 840

27

(Tex. App.—Houston [14th Dist.] 2024, pet. denied) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)); *see also S.D.*, 980 S.W.2d at 763. Accordingly, the trial court was permitted to consider this evidence as it relates to Mother's future acts of endangering B.G.J. in its best interest evaluation.

### 3. *The Consideration of Mother's Medical Records*

Mother next argues that the trial court erred in making findings of fact that refer to and concern the *cause* of her medical conditions, the substance of which are included within her medical records that were admitted at the final hearing. She cites to *McGee v. Tatum*, No. 05-21-00303-CV, 2022 WL 17248174 (Tex. App.—Dallas Nov. 28, 2022, no pet.) (mem. op.), in support of her argument. However, *McGee* is distinguishable. In *McGee*, the Fifth Court of Appeals held that medical records that included a diagnosis as to the cause of a person's injury were too conclusory to constitute evidence of causation; instead, expert testimony was necessary to prove causation. *McGee*, 2022 WL 17248174, at *4.

Here, unlike in *McGee*, the trial court's findings of fact do not constitute evidence of either causation or a medical diagnosis. Rather, the trial court's findings merely describe observations or facts about Mother's medical care that were noted and recorded by others. Further, any possible reference in the trial court's findings as to Mother's medical conditions—such as that alcohol use can result in complications with a mother's pregnancy—are not outside the scope of a layperson's common knowledge. *See Guevara v. Ferrer*, 247 S.W.3d 662, 669 (Tex. 2007) (a layperson's "general experience and common sense" enables the layperson to determine the causal relationship between an event and the resulting condition); *see also* John Stogner, *The War on Whiskey in the Womb: Assessing the Merit of Challenges to Statutes Restricting the Alcohol Intake of Pregnant Women*, 7 Rutgers J.L. & Pub. Pol'y 259, 265 (2010) ("Both the World Health Organization and the

United States Surgeon General have warned about the dangers of alcohol use by pregnant women. This has led to sufficient publicity for the dangers to be considered common knowledge.") (internal citations omitted); *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991) ("From ancient times, the danger of alcoholism from prolonged and excessive consumption of alcoholic beverages has been widely known and recognized.") (discussing the common knowledge of the danger of developing alcoholism from prolonged and excessive consumption of alcoholic beverages); Clarke E. Khoury, *Warning Labels May Be Hazardous to Your Health: Common-Law and Statutory Responses to Alcoholic Beverage Manufacturers' Duty to Warn*, 75 Cornell L. Rev. 158, 177 (1989) ("[T]he risks to pregnant women who consume alcohol are matters of common knowledge.").

For example, Mother challenges the trial court's finding that "[B.G.J.] has developmental delays [that] cannot be ruled out due to [Mother's] alcohol use during pregnancy." However, the parties stipulated at the final hearing that Heiser was an expert and could testify in that capacity. Heiser testified that she received information from B.G.J.'s pediatrician that B.G.J. was exposed to Mother's alcohol consumption while he was in utero, and she stated that this exposure could be a cause of B.G.J.'s developmental delays. Moreover, the trial court's findings that pertain to the substance of Mother's medical records were either quoted directly from the records—which were admitted at the final hearing—or based on Mother's testimony, including her admissions to the condition of her placenta and excessive alcohol abuse during her pregnancy with B.G.J. *See Guevara*, 247 S.W.3d at 669. Therefore, the trial court did not abuse its discretion when it referred to or relied on Mother's medical records in issuing its findings of fact.

#### 4. *Sufficiency of the Evidence – Designation of B.G.J.'s Residence*

Finally, Mother challenges multiple aspects of the trial court's findings of fact as lacking legally and factually sufficient evidence to support its decision to grant Father the exclusive right to determine B.G.J.'s primary residence. Specifically, Mother challenges the trial court's findings that are based on: (1) Mother's employment records; (2) Mother's Intoxalock records; (3) Mother's medical records; (4) whether B.G.J.'s developmental delays could be attributable to Mother's alcohol abuse; (5) Father's SCRAM records; (6) "[Mother's] physical abuse towards [Father]"; (7) Mother's arrest and subsequent conviction for DWI; (8) Mother's and Father's psychological evaluations; (9) B.G.J.'s medical records from Shannon Medical Center; and (10) expanding the geographical restriction for B.G.J.'s residence to include Pecos County as being in B.G.J.'s best interest.

When we consider whether the trial court's findings are supported by legally or factually sufficient evidence, we follow the well-established standards. A legal sufficiency review requires that we determine whether the evidence in support of the challenged finding rises to a level that would enable reasonable and fair-minded people to arrive at the decision under review. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 897–98 (Tex. 2020); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We will sustain a challenge to the legal sufficiency of the evidence that supports a disputed fact finding when (1) evidence of a vital fact is absent, (2) the rules of law or evidence prohibit the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782–83 (Tex. 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)); *City of Keller*, 168 S.W.3d at 810.

In reviewing a factual sufficiency challenge, we must consider and weigh all the evidence—not just the evidence that support's the trial court's finding—and determine whether the evidence supporting the order is so weak or against the overwhelming weight of the evidence such that the order is clearly wrong and manifestly unjust. *See City of Keller*, 168 S.W.3d at 826; *E.R.D.*, 671 S.W.3d at 687. If the evidence is conflicting, we must presume that the factfinder resolved any inconsistencies in favor of the order if a reasonable person could do so. *City of Keller*, 168 S.W.3d at 821. In this regard, the trial court, as the factfinder, is in the best position to observe and assess the witnesses, their demeanor, and their credibility, and we afford great latitude and deference to the trial court when determining the best interest of a child. *E.R.D.*, 671 S.W.3d at 687; *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied).

In this case, the evidence is legally and factually sufficient to support the trial court's findings of fact that are necessary to the disposition of this appeal. Mother's employment records show that she was reprimanded for being intoxicated on July 27, 2021, during an administrative meeting with Dublin I.S.D.; as a result, she was later placed on administrative leave. Entries in Mother's Intoxalock records show that she was intoxicated and registered a blood alcohol level in excess of 0.08 on at least forty-five occasions while she was pregnant with B.G.J. Further, at the final hearing, Heiser testified that she believed B.G.J. had possible neurological deficiencies, and that B.G.J.'s pediatrician had diagnosed B.G.J. as having been adversely affected by Mother's excessive use of alcohol, which was consistent with Heiser's observations of B.G.J.'s cognitive development.

We note that Mother is correct that the trial court's findings that she was arrested for DWI on October 14, 2021, and later convicted of this offense on August 10, 2022, are not expressly supported by the absence of Mother's arrest

records and Judgment of Conviction. However, her employment records indicate that she was "in jail" for a DWI arrest on October 14, 2021, and she admitted at the final hearing that she was placed and remained on community supervision for this offense until August 9, 2023. Therefore, while some discrepancies may exist in the trial court's findings as to this specific fact, the evidence in the record before us shows that Mother—as she admitted in open court—has a history of alcohol abuse, which coincided with her pregnancy with B.G.J.

Mother also argues that there is no evidence that she was physically abusive towards Father because this allegation is based "solely on evidence that [Mother] was charged with assaulting Father." However, Father testified that he believed Mother was belligerent and violent when she consumed alcohol, and that he had previously attempted to present evidence of Mother's domestic violence to the "county attorney." As such, there is more than a scintilla of evidence to support these findings.

The trial court's findings that are based on Mother's and Father's psychological evaluations are quoted directly from the records that were admitted at trial. These records show that Mother has issues with "reactivity and hostility," which the psychologist believed could affect her sobriety, although it was also noted that Mother should not be prevented from having access to or custody of B.G.J. Similarly, the psychologist determined that Father should not be prevented from having access to or custody of B.G.J. and noted that Father's "downside" was his levels of defensiveness and his motivation to appear "blame-free." Therefore, we conclude that legally and factually sufficient evidence supports the trial court's best interest determination that the "downsides" as noted in Father's psychological report are less detrimental to B.G.J. when compared to Mother's "issues."

Finally, the trial court's findings that B.G.J.'s complications at birth were caused by his exposure to Mother's alcohol consumption while he was in utero and that Mother received minimal prenatal care, are supported by statements and findings made by medical professionals that are noted and included in B.G.J.'s medical records. These medical records also state that Mother experienced a relapse the week before B.G.J. was born. While Mother's medical records are sealed, other evidence was adduced at trial that establish these facts and support the same findings of fact—such as Mother's admission that she is an alcoholic and that her medical records show that "[a]fter birth, [her] placenta fell apart and was calcified and quite unhealthy."

When a trial court appoints both parents as joint managing conservators of a child, it must designate to one parent the exclusive right to determine the child's primary residence, and, in doing so, the trial court may either: (1) establish a geographical restriction for the child's primary residence; or (2) specify that the designating conservator may determine the child's primary residence without regard to geographic location. FAM. § 153.134(b)(1); see Allen v. Allen, 475 S.W.3d 453, 457 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In determining the issues of conservatorship and possession of and access to the child, the best interest of the child is the trial court's paramount consideration. FAM. § 153.002. As such, the trial court is given wide latitude in ascertaining the child's best interest. See Gillespie, 644 S.W.2d at 451.

By challenging the trial court's best interest finding, Mother argues that the trial court failed to give appropriate weight to evidence that she had successfully completed an inpatient rehabilitation admission and had a period of sustained sobriety. However, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. In re J.F.-G., 627 S.W.3d 304, 312 (Tex. 2021). We are not

at liberty to disturb the determinations of the trier of fact so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Giving due deference to the trial court, as we must, we conclude that, based on the evidence presented, the application of the *Holley* factors, and the risk that Mother's ongoing alcohol addiction could affect B.G.J.'s emotional and physical development and well-being, the trial court could have reasonably believed that designating Father as the conservator with the exclusive right to determine B.G.J.'s primary residence is in B.G.J.'s best interest. *See Holley*, 544 S.W.2d at 371–72. In this instance, legally and factually sufficient evidence supports the trial court's determination and finding.

Moreover, when a complaint is raised concerning the trial court's custody finding that involves the relocation of the child, we consider in our analysis the factors identified by the Texas Supreme Court in *Lenz*, which include: (1) the relationship with and presence of extended family; (2) the presence of friends; (3) the presence of a stable and supportive environment; (4) the custodial parent's improved financial situation and ability to provide a better standard of living for the child; (5) the positive impact on the custodial parent's emotional state, with beneficial results to the child; (6) the noncustodial parent's right to have regular and meaningful contact; (7) the ability of the noncustodial parent to relocate; and (8) the ability of the noncustodial parent to adapt his or her work schedule to accommodate the child. *Lenz*, 79 S.W.3d at 15–19; *Allen*, 475 S.W.3d at 457; *see also* FAM. § 153.001. While *Lenz* concerned a trial court imposing geographical restrictions in a modification proceeding, these factors apply equally to an original SAPCR proceeding. *Morgan v. Morgan*, 254 S.W.3d 485, 488 (Tex. App.—Beaumont 2008, no pet.).

The trial court made the following finding regarding its geographical restriction:

> [Mother] testified that she lived and worked in San Angelo, Texas when not in possession of the child, and if she was primary she wanted the child's residence in San Angelo, Texas (Tom Green County, Texas), so found it to be in the child's best interest for [Father] to expand the geographical restriction to Pecos County, Texas when the distance between Tom Green County, Texas and Erath County, Texas is similar to the distance between Tom Green County, Texas and Pecos County, Texas; almost equal driving distances.

The evidence shows that both Mother and Father desired to relocate so they could be closer to their respective support groups. At the final hearing, Mother testified that she was living in Brady (McCulloch County) with her parents while at the same time working periodically at her sister's boutique in San Angelo (Tom Green County). Mother also stated that she intended to move to San Angelo at some point in the future so that B.G.J. could interact with her family when she has custody of him.

Father testified that he wanted to move with B.G.J. to his ranch in Pecos County so he could be closer to his support network of family and friends and pursue potential job opportunities there. Father also stated that he communicated with B.G.J.'s physicians about B.G.J. continuing his medical care at the physicians' medical facilities in Midland, and he confirmed with them that B.G.J. would receive the same level of medical care if he and B.G.J. relocated to Pecos County. Further, neither party testified that they would be burdened by the trial court's geographical restriction when they exchanged and exercised visitation between Tom Green County and Pecos County when compared to the trial court's previous restriction—travel from McCulloch County to Erath County.

35

Mother also testified that she believed Father intended to move to Pecos County to "alienate" her from B.G.J. The trial court appears to have rejected this assertion. As we have said, the trial court is best suited to weigh the evidence, observe and assess the demeanor and credibility of the witnesses, and to determine what is in the child's best interest. The evidence here supports the trial court's factual findings, and we may not second-guess them. *See In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no pet.) ("The appellate court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences.").

Based on this record, the trial court could have reasonably balanced the *Lenz* factors when it determined that it is in B.G.J.'s best interest to expand the geographical restriction to Pecos County in light of (1) B.G.J.'s relationship with both Mother's and Father's families, (2) Father's reasons for relocating B.G.J., (3) Father's improved ability to provide a better standard of living for B.G.J., (4) the status and uncertainty of Mother's current and future living arrangements and employment opportunities, and (5) B.G.J.'s access to continuing medical services. Thus, we conclude that legally and factually sufficient evidence supports the trial court's finding to expand the geographical restriction to Pecos County. Here, the trial court could have reasonably determined that the expansion of this geographical restriction would not interfere with B.G.J.'s ability to have continuous contact with Mother, as well as her other family members in Tom Green County.

When there is conflicting evidence, as in the case before us, we defer to the factfinder to resolve any such conflicts. Further, in circumstances in which a reasonable factfinder could resolve conflicting and disputed evidence in favor of either party, we must presume that it did so in favor of the party that prevailed. As

such, we will not disturb the trial court's findings when, as in this case, its findings are supported by legally and factually sufficient evidence.

Viewing the evidence in its entirety and considering the *Lenz* factors and the applicable standards of review, we conclude that the evidence before us is legally and factually sufficient to support the trial court's determination and finding that it is in B.G.J.'s best interest to extend the geographical restriction of his residency to include Pecos County and contiguous counties. Therefore, the trial court did not abuse its discretion in making this finding. *See City of Keller*, 168 S.W.3d at 827. Accordingly, we overrule Mother's second issue.

IV. *This Court's Ruling*

For the reasons stated, we affirm the final order of the trial court.

W. STACY TROTTER
JUSTICE

November 15, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.